UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZIVAN ZABAR, ADMINISTRATOR OF
THE ESTATE OF MAYA ZABAR,

                    Plaintiff,

          v.

NEW YORK CITY DEPARTMENT OF
EDUCATION; MANUEL UREÑA,
PRINCIPAL OF HIGH SCHOOL OF ART
AND DESIGN; LYNN ROSALES,
ASSISTANT PRINCIPAL OF HIGH
SCHOOL OF ART AND DESIGN; SARI
PEREZ, ASSISTANT PRINCIPAL OF
HIGH SCHOOL OF ART AND DESIGN,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

18 Civ. 6657 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          Plaintiff Zivan Zabar – in his capacity as Administrator of the Estate of Maya

Zabar – asserts disability discrimination claims against Defendants New York City Department

of Education ("DOE"); Manuel Ureña, principal of DOE's High School of Art and Design (the

"High School"); and Lynn Rosales and Sari Perez, assistant principals at the High School

(collectively "Defendants") pursuant to the Americans with Disabilities Act ("ADA"), the New

York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law

("NYCHRL").  Plaintiff contends that Defendants retaliated against Maya Zabar ("Zabar"), a

former English teacher at the High School, because she (1) requested accommodations for her

anxiety and depression, and (2) complained of discrimination.  (Am. Cmplt. (Dkt. No. 37) ¶¶ 24-

25, 66)

The Complaint was filed on July 24, 2018 (Dkt. No. 1), and the Amended Complaint was filed on October 4, 2018.  (Dkt. No. 37)  On January 29, 2021, Defendants moved for summary judgment.  (Dkt. No. 102)  Defendants contend that any adverse actions they took against Zabar – whether disciplinary letters, negative evaluations of Zabar's teaching, or formal charges under New York Education Law § 3020-a – were justified by Zabar's "unprofessional behavior" and "poor pedagogy."  (Def. Br. (Dkt. No. 103) at 15)[1]

On April 8, 2024, Defendants filed a suggestion of death, stating that Zabar had died on September 9, 2022.  (Dkt. No. 114)  Zivan Zabar moved for substitution as Plaintiff on July 3, 2024 (Dkt. No. 118), and this Court granted that motion on July 22, 2024.  (Dkt. No. 123)

For the reasons stated below, Defendants' motion for summary judgment will be granted.

## BACKGROUND

## I.    FACTS[2]

Zabar began working for DOE as an English teacher in 2008.  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶ 105)

---

[1]  The page numbers of documents referenced in this Opinion – other than as to deposition transcripts – correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.  Citations to deposition transcripts correspond to the transcript page numbers, rather than to the page numbers designated by this District's ECF system.

[2]  To the extent that this Court cites facts drawn from movants' Local Rule 56.1 statement, it has done so because Plaintiff has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where Plaintiff disagrees with movants' characterizations of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence.  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

In 2010, she was "diagnosed with . . . major depression and generalized anxiety disorder." (Id. ¶ 106)  Zabar testified that since 2010, she has been hospitalized on several occasions for "severe panic attacks," and that she takes medication and receives therapy for her conditions.  (Glass Decl., Ex. 1 (Zabar Dep. Tr.) (Dkt Nos. 110-1, 110-2) at 45, 48-49)

### A.    Zabar's Work at the High School Prior to the 2016-17 School Year

Zabar "began employment as an English teacher at the High School of Art and Design . . . in the 2013-2014 school year."  (Def. R. 56.1 Stmt. (Dkt. No. 106) ¶ 2)

In a November 1, 2013 disciplinary letter, Eric Strauss – then the High School principal – states that Zabar made an inappropriate reference to "the events leading to the death of Trayvon Martin" to students in her class.  (Green Decl. Ex. Q (Nov. 1, 2023 Strauss Ltr.) (Dkt. No. 105-17) at 6)  Strauss describes the incident as "an example of poor judgment," and states that Zabar's alleged comment "can also be construed as verbal abuse." (Id. at 1)  This is the only disciplinary letter that Zabar received at the High School prior to the 2016-17 school year.  (See Def. R. 56.1 Reply Stmt. (Dkt. No. 107) ¶ 120)

Until the fall of 2016, Zabar was supervised by Assistant Principal of English Bernadette Mikolajczyk.  (Def. R. 56.1 Stmt. (Dkt. No. 106) ¶ 3)  Mikolajczyk conducted informal classroom observations of Zabar's teaching on at least five occasions between the fall of 2013 and the spring of 2016.  She gave Zabar the following ratings:

- After a November 7, 2013 observation, Mikolajczyk rated Zabar "Effective" in two categories, "Developing" in four categories, and "Ineffective" in three categories.  (Green Decl., Ex. X (Nov. 7, 2013 Evaluator Form) (Dkt. No. 105-24) at 1-2)

- After a March 6, 2014 observation, Mikolajczyk rated Zabar "Effective" in six categories and "Developing" in three categories.  (Green Decl., Ex. Y (Mar. 6, 2014 Evaluator Form) (Dkt. No. 105-25) at 1-2)

- After a January 15, 2016 observation, Mikolajczyk rated Zabar "Effective" in six categories and "Developing" in two categories. (Green Decl., Ex. Z (Jan. 15, 2016 Evaluator Form) (Dkt. No. 105-26) at 1-5)

- After a March 16, 2016 observation, Mikolajczyk rated Zabar "Effective" in seven categories and "Developing" in one category. (Green Decl., Ex. AA (Mar. 16, 2016 Evaluator Form) (Dkt. No. 105-27) at 1-5)

- After a May 5, 2016 observation, Mikolajczyk rated Zabar "Effective" in seven categories and "Developing" in two categories. (Green Decl., Ex. BB (May 5, 2016 Evaluator Form) (Dkt. No. 105-28) at 1-5)

Zabar "consistently received Satisfactory or Effective ratings from the beginning of her employment through the end of the 2015-16 school year." (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶ 109)  In June 2016, Zabar "was rated Effective overall on her final annual performance rating for the 2015-16 school year." (Id. ¶ 110)

B.    **Defendants Ureña and Rosales Arrival at the High School**

Defendant Manuel Ureña became the principal of the High School in January 2016.  (Def. R. 56.1 Stmt. (Dkt. No. 106) ¶ 12)  In the fall of 2016, Defendant Lynn Rosales replaced Mikolajczyk as the Assistant Principal of English at the High School, and Rosales became Zabar's supervisor.  (Id. ¶ 19)

During the 2016-17 school year, Zabar became the United Federation of Teachers ("UFT") union representative for the High School English Department.  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶ 111)  Zabar testified that she attended "a minimum of three meetings" with school administrators during the 2016-17 school year in her capacity as union representative. (Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 70)  At those meetings, Zabar raised concerns related to "[t]he air conditioning, the lack of [a] second year of [a foreign language], being moved to a single session school, [and] the SAT prep class."  (Id. at 70-71)  Zabar "remained on the union executive board for the 2017-18 school year and continued to be vocal

with school administration as an advocate for teachers in her department and within the school."
(Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶ 134)

The meetings between UFT representatives and school administrators were "quite contentious," and Defendants Ureña and Rosales were sometimes "rude" to Zabar at these meetings. (Glass Decl., Ex. 18 (Agosto Aff.) (Dkt. No. 110-19) ¶¶ 3, 5)

### C.    Zabar's August 2016 Request for a Room Change

In August 2016, Zabar asked Ureña to assign her a different classroom. (Def. R. 56.1 Stmt. (Dkt. No. 106) ¶ 22) Zabar testified that Ureña had

> originally put me in room 801 which is right near the office [of the Assistant Principal of English], and I came in and I requested the room change and I told him being directly near my direct supervisor makes me extremely anxious and can cause PTSD and can trigger me.

(Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 172)

Zabar also "told [Ureña] about [her] anxiety," and Ureña "kind of nodded in agreement – okay, no problem." (Id. at 173) Zabar testified that she also "probably" told Ureña about her depression "around the same time [she] told him about the anxiety," although she "cannot recall a conversation" with Ureña about her depression. (Id. at 176) Zabar further testified that, in general, "all [her] colleagues know [she] ha[s] depression and anxiety"; that "[i]t is not a secret" at the High School; that even her "students knew"; and that "[i]t was something [she] actually used in the classroom to help [her] students understand certain things in literature." (Id. at 168, 172) Jason Agosto – a former social studies teacher and UFT chapter leader at the High School – states in an affidavit that Zabar "was outspoken about her disabilities related to depression, anxiety, and PTSD" and that Zabar "mentioned it at meetings with the school administration and at UFT consultation committee meetings." (Glass Decl., Ex. 18 (Agosto Aff.) (Dkt. No. 110-19) ¶ 4)

Ureña granted Zabar's request for a room change, which Zabar found "generous" and "very kind." (Id. at 173) Ureña did not make any comments to Zabar concerning her anxiety and depression. (Id. at 173, 188)

**D.    Zabar's Request for Written Instructions**

Zabar testified that during a meeting with Defendant Rosales in the "first week of September" 2016, she told Rosales that she suffered from anxiety:

> [Rosales] called me in to discuss the film history class and it was clear she didn't understand what film is and how it is an art form and you don't interrupt a performance. She ended up kind of threatening my job. I told her, "Listen, I can make whatever changes you want, I just need things in writing." I told her this and I don't remember the exact words but I mentioned to her I was getting upset. At that point, I let her know when I started to get upset, "Look, I have depression and anxiety (I didn't use the word trigger) I'm getting really upset right now and I just didn't understand what you want."

(Id. at 173-74) In testifying that Rosales had "kind of" threatened her job, Zabar explained that Rosales had said, "[y]ou don't want me to take this to Mr. Ureña, do you?" (Id. at 175)

Zabar further testified that, during this meeting, she told Rosales that written instructions "would help with [Zabar's] anxiety." (Id. at 203) Rosales, by contrast, testified that Zabar never told her that she had been diagnosed with anxiety and depression, and that Zabar said only that she was "stressed." (Green Decl., Ex. V (Rosales Dep.) (Dkt. No. 105-22) at 82)

Zabar testified that written instructions "help[] [her] a great deal with anxiety" and "really helps stave off panic attacks":

> When I have things in writing, it means if I have questions or if I'm not understanding what they want I actually have a document with words on it and I can go and write you wrote this, what do you mean by that; and it is solid, tangible, something I can touch. You can't argue with words on a piece of paper, you can argue the meaning but the words are the words. If I don't have these things, like I get a verbal instruction and then I find out another teacher got a similar but not exactly the same instruction, it is very confusing and I'm not sure because they give us contradictory instructions as though we want everyone doing the same thing at the same time but at the same time they don't have the materials for it so they tell us - all right, do what you can. That is extremely anxiety

inducing because now they are putting on your shoulders what the decision is and, if you make the wrong decision whatever it is, you can get called out for it.

(Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 201-02)

Zabar testified that early in her career she learned to ask for written instructions as a way to protect herself from unfair criticism:

> I ask all my supervisors for things in writing. That is something I learned in my 20s when I worked in the corporate world where I realized, if you didn't put something in writing, that is one way they can use to blame you for something you did. As they said in the corporate world, cover my ass.

(Id. at 205-06)

Rosales was "dismissive" of Zabar's request for written instructions, and "just brushed it . . . off" like she "didn't really care." (Id. at 174-75, 184) Moreover, "[e]very time [she] told [Rosales] [that she] was stressed out or anxious, [Rosales] was just dismissive every time." Zabar does not recall that Rosales ever made any comments about Zabar's anxiety and depression, however. (Id. at 188-89)

During the 2016-17 and 2017-18 school years, Zabar repeated her request for written instructions. She

> kept asking [Rosales,] "Can you put things in writing, I'm really stressed out?" Nothing was put in writing so that first time [in September 2016] might not necessarily be based on my anxiety but all the subsequent times were. . . .
>
> There wasn't one occasion. It was every time I was given instructions, every time I was told to do something, I said, "Great, can you get that to me in writing so I remember it," so it was a constant request, it wasn't just one time.

(Id. at 206-07)

All of Zabar's requests for written instructions were "ignored." (Id. at 211) She made her final request for written instructions in "spring 2018." (Id. at 207)

E.    **Disciplinary Letters Issued to Zabar During**
      **the 2016-17 and 2017-18 School Years**

Defendants Ureña, Rosales, and Perez began issuing disciplinary letters to Zabar

in the 2016-17 school year.

1.    **November 5, 2016 Disciplinary Letter**

In a November 5, 2016 disciplinary letter, Rosales stated that Zabar had "raised

[her] voice" during a September 9, 2016 meeting related to Zabar's film history course.[3]  (Green

Decl., Ex. B (Nov. 5, 2016 Disciplinary Ltr.) (Dkt. No. 105-2) at 1)  The letter also states that

Zabar "acknowledge[d] 'snapping' at [Rosales] at that meeting."  (Id.)  In the letter, Rosales also

asserts that on September 15, 2016, Zabar was

> seen in [her] classroom at 2:30 instead of the assigned room for [Common
> Planning Time ("CPT")] time.  I sent you a reminder of CPT time via email on
> Friday, September 16th to which you responded on Friday, September 16th
> stating, "I didn't realize that I wasn't allowed to urinate during CPT."  You read
> and confirmed that the email was yours.  Following further clarification of the
> moment in question, in an email I sent you on Friday, September 16th, you
> responded Sunday, September 18th stating, "You are lying."

(Id.)

Zabar testified that she "wasn't given an opportunity" to offer a rebuttal, and that

"by the time [she] remembered, it was too late to add anything."  (Glass Decl., Ex. 1 (Zabar

Dep.) (Dkt Nos. 110-1, 110-2) at 131)

2.    **November 17, 2016 Disciplinary Letter**

In a November 17, 2016 disciplinary letter, Ureña states that

> on November 3rd, 2016[, Assistant Principal Sari Perez] witnessed and heard you,
> in a loud voice, disparaging an administrator, Ms. Rosales (Ap Humanities),
> regarding her instructional and administrative abilities and practices; specifically,
> that she doesn't do her job in her class, expects much more from her teachers than
> what she delivers, and that she is excessively absent.  I pointed out to you that Ms.

---

[3]  This appears to be the same encounter in which Zabar first requested written instructions.

> Perez reported that she was at least 15 feet away inside room 103 and that the
> conversation you were having was with Alice O'Neil (UFT District
> Representative) and Barbara Komansky (ESL Teacher). . . . [At a November 10,
> 2016 meeting] I pointed out to you that you work in a school and professional
> comportment must be adhered to at all times.  In this case, having a conversation
> in an open public area disparaging an assistant principal is unprofessional
> behavior.

(Green Decl., Ex. C (Nov. 17, 2016 Disciplinary Ltr.) (Dkt. No. 105-3) at 1)

At her deposition, Zabar agreed that she had a discussion with O'Neil on

November 3, 2016 during which she criticized Rosales "in the public lobby of the building."

(Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 127; see also Pltf. R. 56.1 Cntrstmt.

(Dkt. No. 109) ¶ 119)

### 3.    February 17, 2017 Disciplinary Letter

In a February 17, 2017 disciplinary letter, Rosales describes Zabar's

"unprofessional conduct" during a December 19, 2016 conference following a classroom

observation.  According to Rosales, Zabar said, inter alia, "I think we are finished because we

aren't going to agree on what I did"; "[t]his is my livelihood and you don't give a rat's ass about

it"; and "I don't need any of this shit that you guys ask for."  (Green Decl., Ex. H (Feb. 27, 2017

Disciplinary Ltr.) (Dkt. No. 105-8) at 1)

Zabar admits making the "rat's ass" comment during the December 19, 2016

conference with Rosales.  (Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 150-51)

### 4.    April 19, 2017 Disciplinary Letter

In an April 19, 2017 disciplinary letter, Ureña wrote that

> [an] allegation was made by a student who indicated that you were behaving in an
> unprofessional manner several times during your period 2 class.  To wit, that you
> have:
>
> - used profanity regularly when speaking during class time.
> - used class time to discuss issues regarding your personal life.
> - discussed with students your discontent with the Principal.

(Green Decl., Ex. J (Apr. 19, 2017 Disciplinary Ltr.) (Dkt. No. 105-10) at 1)  Ureña further states that he reviewed "four statements written by students from that class who were chosen and interviewed at random."  The students "were consistent with their descriptions and corroborations of all parts of the original allegation."  (Id. at 1-2)

At her deposition, Zabar testified that she "[s]ometimes" uses profanity in the classroom, although she denies ever "cursing at the kids."  (Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 215)  Zabar explained that she allows students to use profanity in the classroom for a "pedagogical reason."  According to Zabar,

> there are students that get very passionate about what they want to say and working against default the way they would speak with their friends that is with curses and slang.  In the classroom, they struggle to get it out without cursing and I don't want that.  I want to know what they know.  In my classroom, the rule is if you want to curse, okay, I'll let you know when it is too much because there is such a thing as too much.

(Id. at 213)

### 5.    September 20, 2017 Disciplinary Letter

At least by September 2017, Principal Ureña viewed Zabar as one of a handful of problematic teachers that remained at the High School.  In a September 2, 2017 text message to Marisol Rosales, the superintendent of DOE District 2, Ureña took credit for hiring new teachers and encouraging problematic teachers to leave:

> As for these knucklehead teachers, many left or retired.  I hired 19 dynamic and young teachers.  Between last year and this one we added 35 new teachers . . . a great way to change the culture [here] and train the future leaders of our school. We are down to just Jason [Agosto], [Todd] Young, and [Maya] Zabar.  I even got Nancy Richards to transfer and Komansky to retire.  It sounds like addition by subtraction.

(Glass Decl., Ex. 16 (Sept. 2, 2017 Ureña Text Msg.) (Dkt. No. 110-17) at 1)

In a September 20, 2017 disciplinary letter, Ureña asserts that on June 23, 2017, Zabar "left the school building at 1:04 pm; two hours and six minutes before the end of [her]

work schedule for that day (3:10 pm)," and that Zabar "never called anyone once [she] left, never

attempted to CLOCK OUT . . . [and] never informed anyone in the upcoming days." (Green

Decl., Ex. K (Sept. 20, 2017 Disciplinary Ltr.) (Dkt. No. 105-11) at 1)

Zabar admits that she left early on June 23, 2017, but explains that

> Mr. Urena had already dismissed, he released the entire art department so one
> department was free to go. I was coming down with a migraine. I looked for an
> [Assistant Principal] so I could leave. No [Assistant Principal] was found so I just
> left. I don't remember if I clocked out because I was coming down with a
> migraine.

(Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 217)

### 6.    March 16, 2018 Disciplinary Letter

In a March 16, 2018 disciplinary letter, Defendant Sari Perez alleges that Zabar's

"time card shows [that she] clocked [out] at 9:32 am on February 2, 2018 . . . for a meeting

[outside of the school] that was scheduled at noon." (Green Decl., Ex. N (Mar. 16, 2018

Disciplinary Ltr.) (Dkt. No. 105-14) at 1) Zabar does not dispute that she left the school that

day. (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶ 73)

### 7.    May 2, 2018 Disciplinary Letters

Three disciplinary letters were issued to Zabar on May 2, 2018.

In the first such letter, Rosales wrote that on January 17, 2018,

> [w]hen other teachers had left [Common Planning Time], I asked for you to
> explain why you had given an exam that was not approved for the 10th grade –
> when one was provided to you. You stated that you did not feel the exam was
> appropriate. I asked you why you chose to change it without speaking with me
> and you began to yell, "I didn't get the exam in time. I got it only a few hours
> before I had to give it." . . . .

> At the meeting on January 17, 2018 you continued to yell at me saying that I do
> not help you and that you did not have the midterms in time. . . . You then walked
> out still yelling and in front of [room] 607 office staff you stated, "Done – write
> me up and put a letter in my file . . . write me up for my fucking tone, I don't
> care!" . . . .

> [At a January 30, 2018 meeting,] I asked you to respond to what occurred on
> January 17, 2018.  You denied saying "Done – write me up and put a letter in my
> file . . . write me up for my fucking tone, I don't care!" and said "Would you like
> me to play the recording?" standing and pointing your cell phone in my direction.
> I asked you to calm down, as you were becoming more irate, holding your hand
> up to motion that I should stop talking.  I suggested that you step out to compose
> yourself to which you replied yelling, "I'm leaving and I'm not coming back!"
> You then threw the door open, slamming it against the wall and then slammed it
> shut."

(Green Decl., Ex. P (May 2, 2018 Disciplinary Ltr.) (Dkt. No. 105-16) at 1-2)

In a January 17, 2018 letter that was "placed in [Zabar's personnel] file," John

Brinegar, a secretary at the High School (Def. R. 56.1 Stmt. (Dkt. No. 106) ¶ 82), states that on

that day

> Ms. Zabar was leaving a meeting with Ms. Rosales in room 607's conference
> room and proceeded to tell Ms. Rosales that she was "done – write me up and put
> a letter in my file . . ."  As she passed in front of my desk, she said "write me up
> for my fucking tone, I don't care!"

(Green Decl., Ex. R (Brinegar Jan. 17, 2018 Ltr.) (Dkt. No. 105-18) at 1)

At deposition, Zabar admitted that she said to Rosales, "go ahead and write me up

with the curse word."  Zabar "was mad" and "was just angry [she] was being accused."  (Glass

Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 255)  Zabar also testified that she "used

profanity" during the January 30, 2018 encounter with Rosales, and that she left the High School

and did not return that day.  (Id. at 240, 253)

In a second disciplinary letter issued on May 2, 2018, Rosales asserts that Zabar

had not completed required activities on "Atlas, [the High School's] online curriculum mapping

program, since November 20th"; that Zabar "did not submit [her] exams on time, nor did [she]

administer the correct exam to [her] 10th grade classes"; and that Zabar did not conduct parental

outreach "from October 18, 2017 to January 29, 2018."  (Green Decl., Ex. S (May 2, 2018

Disciplinary Ltr.) (Dkt. No. 105-19) at 1)

In the third disciplinary letter issued on May 2, 2018, Rosales asserts that Zabar "fail[ed] to attend Common Planning Time (CPT) on February 28, 2018 and on March 7, 2018." (Green Decl., Ex. T (May 2, 2018 Disciplinary Ltr.) (Dkt. No. 105-20) at 1)

Zabar admits that she was absent from CPT on both occasions. She testified that she "forgot" on the first occasion and that on the second occasion, she "had an excessively upset stomach" and was "in the bathroom most of the time." (Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 256-57)

### 8.     June 21, 2018 Disciplinary Letter

In a June 21, 2018 disciplinary letter, Defendant Perez lists fourteen days between October 2017 and June 2018 in which Zabar was absent from work, and two days in which Zabar arrived at work more than three hours late. (Green Decl., Ex. U (June 21, 2018 Disciplinary Ltr.) (Dkt. No. 105-21) at 1) Twelve absences are listed in DOE records as "Self-Treated"; one is listed as "Medically Certified"; and one is listed as "Personal Business." (Id.) Perez writes that Zabar's "record of absences is excessive." (Id. at 2) Perez states that while Zabar claimed that her absences related to "anxiety and panic attacks," she did not request medical leave under the Family and Medical Leave Act. (Id.)

At deposition, Zabar admitted that she was "out 14 days" – as stated in the letter – even though the union "contract says ten days is what is given to you." (Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 260) Zabar also testified that while her absence from work was caused by "panic attacks," she had not informed school administrators of the reason for her absences. (Id. at 258-59)

### F.     Zabar's Performance Evaluations for the 2016-17 and 2017-18 School Years

During the 2016-17 and 2017-18 school years, Defendants Rosales and Ureña conducted multiple classroom observations of Zabar's teaching, and rated her as follows:

- After a December 12, 2016 observation, Rosales rated Zabar "Effective" in two categories, "Developing" in four categories, and "Ineffective" in one category. (Green Decl., Ex. D (Dec. 12, 2016 Evaluation Form) (Dkt. No. 105-4) at 1-6)

- After a March 22, 2017 observation, Rosales rated Zabar "Effective" in two categories and "Ineffective" in five categories. (Green Decl., Ex. E (Mar. 22, 2017 Evaluation Form) (Dkt. No. 105-5) at 1-4)

- After a March 24, 2017 observation, Ureña rated Zabar "Effective" in one category and "Ineffective" in six categories. (Green Decl., Ex. F (Mar. 24, 2017 Evaluation Form) (Dkt. No. 105-6) at 1-4)

- After a May 30, 2017 observation, Rosales rated Zabar "Effective" in two categories, "Developing" in three categories, and "Ineffective" in six categories. (Green Decl., Ex. G (May 30, 2017 Evalution Form) (Dkt. No. 105-7) at 1-4)

- After a November 27, 2017 observation, Ureña rated Zabar "Effective" in two categories and "Ineffective" in five categories. (Green Decl., Ex. L (Nov. 27, 2017 Evaluation Form) (Dkt. No. 105-12) at 1-5)

- After a December 14, 2017 observation, Rosales rated Zabar "Developing" in two categories and "Ineffective" in six categories. (Green Decl., Ex. M (Dec. 14, 2017 Evaluation Form) (Dkt. No. 105-13) at 1-7)

- After a May 1, 2018 observation, Rosales rated Zabar "Effective" in one category and "Ineffective" in six categories. (Green Decl., Ex. O (May 1, 2018 Evaluation Form) (Dkt. No. 105-15) at 1-6)

At deposition, Zabar complained that the evaluation forms "tell[] you what [she] doesn't] do" in the classroom, rather than "what [she] actually do[es]"; that the forms contain "contradictions"; and that Rosales and Ureña "cherry pick[]" observations. (Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 133, 136, 147) On several of the evaluations, Zabar wrote contemporaneous objections. For example, on the November 27, 2017 evaluation form, Zabar wrote that it "completely misrepresents and/or outright tells false about what happened during class," and "examines the lesson in a vacuum." (Green Decl., Ex. L (Nov. 27, 2017 Evaluation Form) (Dkt. No. 105-12) at 9) And on the December 14, 2017 evaluation, Zabar wrote that "this observation is filled with misrepresentations & only focuses on things I did <u>not</u>

do during the observation." (Green Decl., Ex. M (Dec. 14, 2017 Evaluation Form) (Dkt. No. 105-13) at 10) (emphasis in original)

Moreover, Zabar filed grievances regarding several of the evaluations, and on three occasions she obtained expungement of unfavorable classroom observation reports. (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶¶ 118, 127, 136) For example, an October 13, 2016 observation report was expunged after an arbitration hearing, because Ureña had attached twenty-two pages of supporting documents without "entering any such evidence on the Evaluator Form" in an electronic format. (Glass Decl., Ex. 20 (Mar. 20, 2017 Opinion and Award) (Dkt. No. 110-21) at 3-4) And a November 22, 2016 observation report was expunged after Zabar complained that it was "inaccurate and misleading." (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶ 127; Glass Decl., Ex. 6 (Nov. 29, 2016 Zabar Grievance Form) (Dkt. No. 110-7) at 1) An October 2, 2017 observation report was expunged because the report "was submitted to [Zabar] after the 45 school day limit." (Glass Decl., Ex. 21 (Dec. 14, 2017 Ltr.) (Dkt. No. 110-22) at 1)

Zabar also points out that at least four other teachers in the English Department at the High School "experienced lower ratings during the 2016-2017 school year" – that is, after the arrival of Ureña and Rosales. (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶ 21) At deposition, Zabar testified that "[n]early everybody in the English department saw reduced ratings" at that time. (Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 106)

In late June 2018, Zabar "received an Ineffective overall rating on her Measures of Teacher Performance ['MOTP'] annual score for the 2017-18 school year." (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶ 149) Zabar "finished with a Developing overall rating for the 2017-18 school year based on her Ineffective MOTP score." (Id. ¶ 150) The "Developing" rating made Zabar subject to a "Teacher Improvement Plan for the 2018-2019 school year." (Id.)

Zabar challenged this performance rating in an Annual Professional Performance

Review ("APPR") appeal pursuant to the collective bargaining agreement between DOE and

UFT.  (Def. R. 56.1 Stmt. (Dkt. No. 106) ¶ 101)  On May 21, 2019, Zabar's appeal was denied.

(Id. ¶ 102)  In its decision, the APPR arbitration panel[4] states that it

> examined the observation reports presented during the hearing.  The reports are
> detailed and specific. They set forth substantial, uncontroverted evidence
> observed by the evaluators supporting their conclusions and the scores assigned.
> Simply put, we find the record devoid of evidence demonstrating the scores
> assigned were the result of any factor other than Zabar's pedagogy as evaluated
> during the classroom observations.

(Green Decl., Ex. CC (May 21, 2019 Opinion and Award) (Dkt. No. 105-29) at 17-18)  The

panel concludes that "the overall rating of Developing assigned to Zabar for school year 2017-

2018 was not due to harassment, or reasons not related to job performance."  (Id. at 16-17)

### G.    Zabar's EEOC Complaint and DOE's New York Education Law § 3020-a Charges

On March 15, 2018, Zabar filed a complaint with the United States Equal

Employment Opportunity Commission ("EEOC") in which she alleges, inter alia, "disability

discrimination and/or retaliation" at the hands of Defendants Ureña and Rosales.  (Glass Decl.,

Ex. 8 (Mar. 15, 2018 EEOC Charge) (Dkt. No. 110-9) at 1-2)  In the EEOC complaint, Zabar

contends that Defendants' retaliation took the form of "disciplinary letters" and "negative

[classroom] observations," which began shortly after Zabar "informed [Rosales] of [her]

disabilities of clinical depression and generalized anxiety diagnosis, and requested that [Rosales]

---

[4]  The collective bargaining agreement between DOE and the UFT provides that the parties will
"jointly select arbitrators from the parties' panel of arbitrators . . . to hear and decide APPR
Complaint arbitrations."  (Green Decl., Ex. EE (Collective Bargaining Agreement, Article
22(H)) (Dkt. No. 105-31) at 2)  For Zabar's appeal, the arbitration panel consisted of a
"[n]eutral," a DOE representative, and a union representative.  (Green Decl., Ex. CC (May 21,
2019 Opinion and Award) (Dkt. No. 105-29) at 2)

issue [her] instructions in writing as a reasonable accommodation on all instructions going forward." (Id. at 2)  The EEOC issued a right to sue letter on April 26, 2018.  (Glass Decl., Ex. 9 (Apr. 26, 2018 EEOC Ltr.) (Dkt. No. 110-10) at 15)

In an April 30, 2018 email to Rock Myron, an Education Consultant at the Office of Labor Relations within DOE, Ureña states that he "will be proceeding with 3020a charges against Maya Zabar for conduct and discipline."  (Glass Decl., Ex. 22 (Apr. 30, 2018 email chain) (Dkt. No. 110-23) at 2)

On September 5, 2018, DOE filed a bill of particulars and specifications outlining charges against Zabar pursuant to New York Education Law § 3020-a.  (Green Decl., Ex. DD (Sept. 5, 2018 § 3020-a Bill of Particulars) (Dkt. No. 105-30) at 1)  The factual allegations in the § 3020-a charges track many of the disciplinary letters that Zabar received between 2016 and 2018.  (Id. at 2-6)  DOE contends that these factual allegations establish "just cause for disciplinary action" and "just cause for termination."  (Id. at 7)

Ureña recommended that § 3020-a charges be brought against two other teachers at the High School:  Jason Agosto and Todd Young.  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶ 161; Glass Decl., Ex. 2 (May 2, 2019 Ureña Dep.) (Dkt. No. 110-3) at 34-35)

On September 12, 2018, Zabar was "suspended with pay" and "reassigned to Jacqueline Kennedy Onassis High School pending Education Law § 3020-a charges."  (Def. R. 56.1 Stmt. (Dkt. No. 106) ¶ 98; Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶ 153)

## II.    PROCEDURAL HISTORY

The Complaint was filed on July 24, 2018 (Dkt. No. 1), and the Amended Complaint was filed on October 4, 2018.  (Dkt. No. 37)

The Amended Complaint asserts claims for disability discrimination, retaliation, hostile work environment, denial of reasonable accommodations, and violation of Zabar's First

Amendment rights against Defendants DOE, Ureña, Rosales, Perez, and Marisol Rosales –

Superintendent of DOE's District 2 – pursuant to the ADA, the NYSHRL, the NYCHRL, and 42

U.S.C. § 1983.  (Id. ¶¶ 62-74)

In a May 12, 2020 order, this Court dismissed all claims in the Amended

Complaint except for the retaliation claims against (1) Defendant DOE pursuant to the ADA; and

(2) Defendants Ureña, Rosales, and Perez pursuant to the NYSHRL and the NYCHRL.  (May

12, 2020 Order (Dkt. No. 83) at 23-24)  All claims against Marisol Rosales were dismissed.  (Id.

at 24)  This Court also held that Zabar's ADA claims were time-barred to the extent premised on

events that took place prior to May 19, 2017.  (Id. at 8)

The remaining Defendants filed the instant motion for summary judgment on

January 29, 2021.  (Dkt. No. 102)

On April 8, 2024, Defendants filed a suggestion of death stating that Maya Zabar

had died on September 9, 2022.  (Dkt. No. 114)  On July 3, 2024, Zivan Zabar, the Administrator

of Maya Zabar's estate, filed a motion for substitution as Plaintiff.  (Dkt. No. 118)  This Court

granted that motion on July 22, 2024.  (Dkt. No. 123)

## DISCUSSION

Defendants contend that they are entitled to summary judgment because (1) Zabar

has "failed to establish a prima facie case of retaliation" under the ADA, the NYSHRL, and the

NYCHRL; and (2) "Defendants have established legitimate, non-retaliatory and non-pretextual

reasons for all actions complained of by Plaintiff."  (Def. Br. (Dkt. No. 103) at 6)

## I.    LEGAL STANDARDS

### A.    Rule 56 Motions for Summary Judgment

Summary judgment is warranted where the moving party "shows that there is no

genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted). "'[W]here the non[-]moving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the non[-]moving party's claim.'" Lesavoy v. Lane, No. 02 Civ. 10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Mags., Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quotation marks and citation omitted). However, a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. Mere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks, alterations, and citation omitted). "'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" Eviner v. Eng, No. 13-CV-6940 (ERK), 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).

A moving party can demonstrate the absence of a genuine issue of material fact "in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." Nick's Garage,

Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quotation marks and citation omitted)

### B.    Retaliation Claims under the ADA, the NYSHRL, and the NYCHRL

To establish a prima facie claim of retaliation under the ADA and the NYSHRL, a plaintiff must show that "(1) he engaged in an activity protected by the [these statutes]; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).[5] "A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'"

---

[5]  For the time period at issue here, "the standards for evaluating . . . retaliation claims are identical under the NYSHRL . . . and the ADA." Sivio, 436 F. Supp. 3d at 799 (quotation marks omitted) (citing Vasquez v. Empress Ambulance Serv., Inc., 835 F.3d 267, 271 n.3 (2d Cir. 2016).

In August 2019, the NYSHRL was amended to provide that it "shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of [the NYSHRL], have been so construed." N.Y. Exec. Law § 300.  Accordingly, for claims that accrue after this amendment went into effect, "'the standard for [NYSHRL discrimination] claims [is] closer to the standard of the NYCHRL.'" Edelman v. NYU Langone Health Sys., No. 21 Civ. 502 (LGS), 2022 WL 4537972, at *14 (S.D.N.Y. Sept. 28, 2022) (second alteration in original) (quoting Livingston v. City of New York, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021).

However, "courts to date have held that the 2019 NYSHRL amendments are not retroactive." McHenry v. Fox News Network, LLC, 510 F. Supp. 3d 51, 69 (S.D.N.Y. 2020).  And here the final alleged adverse actions against Zabar – the commencement of § 3020-a charges and Zabar's suspension (see Def. R. 56.1 Stmt. (Dkt. No. 106) ¶ 98; Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶ 153) – occurred in 2018, well before the effective date of the 2019 amendment.  Accordingly, the 2019 amendment has no bearing on the resolution of Zabar's retaliation claim under the NYSHRL.

Natofsky v. City of New York, 921 F.3d 337, 353 (2d Cir. 2019) (quoting Littlejohn v. City of New York, 795 F.3d 297, 319 (2d Cir. 2015)).

Once a plaintiff establishes a prima facie case of retaliation, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." Treglia, 313 F.3d at 721. If a defendant meets this burden, "'plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" Id. (quoting Cifra v. G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001). Plaintiff must meet the "ultimate burden of proving 'that the desire to retaliate was the but-for cause of the challenged employment action.'" Sivio v. Vill. Care Max, 436 F. Supp. 3d 778, 799 (S.D.N.Y. 2020) (quoting Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013)). Such proof can include "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its actions," such that "a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013).

Retaliation claims under the NYCHRL are governed by a standard more favorable to plaintiffs. The NYCHRL protects plaintiffs who "oppos[e] any practice forbidden under" the NYCHRL from conduct that is "reasonably likely to deter a person engaging in such action." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 112 (2d Cir. 2012). Moreover, where a plaintiff has established a prima facie case and the defendant has proffered legitimate, non-retaliatory reasons for the challenged conduct, "summary judgment is appropriate [only where] no reasonable jury could conclude . . . that the defendant's 'reasons were pretextual[.]'" Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 76 (2d Cir. 2015) (quoting Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 126 (1st Dep't 2012)). That is,

"summary judgment is appropriate [under the NYCHRL where] 'the record establishes as a matter of law' that discrimination or retaliation 'play[ed] no role' in the defendant's actions." Id. (quoting Mihalik, 715 F.3d at 110 n.8).

## II.    ANALYSIS

Zabar contends that she engaged in "protected activity" when she

> (1) requested a reasonable accommodation from Principal Ureña in the summer of 2016 to change rooms to be located away from her immediate supervisor [Assistant Principal] Rosales, (2) requested from [Assistant Principal] Rosales in September 2016 that all instructions, reminders, or updates regarding anything school-related be in writing or via email as a reasonable accommodation for her mental health conditions, (3) repeated her request for instructions to be placed in writing throughout the 2016-2017 school year; (4) repeated her request for instructions to be placed in writing throughout the 2017-2018 school year; (5) filed a charge with the [EEOC] on March 15, 2018; and (6) commenced and filed this instant federal action on July 24, 2018.

(Pltf. Opp. Br. (Dkt. No. 108) at 16-17)  As for adverse action, Zabar cites the disciplinary letters Ureña, Rosales, and Perez issued to her between November 2016 and June 2018; Ureña and Rosales' negative classroom evaluation reports during the same time period; and DOE's initiation of New York Education Law § 3020-a charges against her in September 2018.  (Id. at 17-18)

Defendants contest only the first and fourth elements of Zabar's prima facie case – i.e., whether Zabar has established that she engaged in protected activity and whether she has demonstrated the requisite causal nexus.  Defendants argue that (1) "a request for accommodation does not constitute protected activity under the NYSHRL and NYCHRL"; (2) "Plaintiff's request for a room change in August 2016 or to receive written directions in September 2016 . . . [do] not qualify as a request for reasonable accommodation" – and therefore do not constitute protected activity – under the ADA; and (3) Zabar has not establish the

requisite causal connection between any of her protected activities and Defendants' adverse actions. (Def. Br. (Dkt. No. 103) at 7-15)[6]

In seeking summary judgment, Defendants also argue – in the alternative – that they "have established legitimate, non-discriminatory reasons for their actions that [Plaintiff] cannot demonstrate are pretextual." (Id. at 15-18)

For the reasons stated below, this Court concludes that Defendants are entitled to summary judgment, because Zabar has not proffered evidence that creates a material issue of fact as to pretext. That is, even assuming arguendo that Zabar has established a prima facie case of retaliation as to each of the claimed protected activities under the ADA, the NYSHRL, and the NYCHRL, Defendants have articulated legitimate, non-retaliatory reasons for their actions, and no reasonable jury could conclude that those reasons are pretextual.

### A.    ADA and NYSHRL

As discussed above, under the ADA and the NYSHRL, "'plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" Treglia, 313 F.3d at 721 (quoting Cifra, 252 F.3d at 216). And in order to defeat summary judgment, Plaintiff must proffer evidence that creates a material issue of fact as to whether "'the desire to retaliate was the but-for cause of the challenged employment action.'" Chen, 805 F.3d at 70 (quoting Nassar, 570 U.S. at 352)); see also Sivio, 436 F. Supp. 3d at 799 ("If the employer articulates a non-retaliatory explanation for its conduct, the presumption of retaliation is eliminated, and the plaintiff must

---

[6] Defendants also note that, pursuant to this Court's May 12, 2020 order, Zabar's ADA claims arising from adverse actions prior to May 19, 2017 are time-barred. (Id.)

meet her ultimate burden of proving 'that the desire to retaliate was the but-for cause of the challenged employment action.'" (quoting <u>Nassar</u>, 570 U.S. at 352)).

In opposing summary judgment, Zabar emphasizes the temporal proximity between many of her protected activities and Defendants' adverse actions.  (<u>See</u> Pltf. Opp. (Dkt. No. 108) at 17-20)  For example, Zabar requested a classroom change from Ureña in August 2016, and requested written instructions from Rosales in September 2016.  Two months later, in November 2016, Rosales issued a disciplinary letter to Zabar – the first of many such letters. Similarly, Zabar filed her EEOC complaint on March 15, 2018 (Glass Decl., Ex. 8 (Mar. 15, 2018 EEOC Charge) (Dkt. No. 110-9) at 1-2), was issued disciplinary letters on March 16, 2018 and May 2, 2018 (Green Decl., Ex. N (Mar. 16, 2018 Disciplinary Ltr.) (Dkt. No. 105-14) at 1; <u>id.</u>, Ex. P (May 2, 2018 Disciplinary Ltr.) (Dkt. No. 105-16) at 1-2; <u>id.</u>, Ex. S (May 2, 2018 Disciplinary Ltr.) (Dkt. No. 105-19) at 1; <u>id.</u>, Ex. T (May 2, 2018 Disciplinary Ltr.) (Dkt. No. 105-20) at 1), and received a negative classroom observation report on May 7, 2018.  (Green Decl., Ex. O (May 1, 2018 Evaluation Form) (Dkt. No. 105-15) at 1-6)

"[T]emporal proximity alone is not enough to establish pretext[, however]." <u>Abrams v. Dep't of Pub. Safety</u>, 764 F.3d 244, 254 (2d Cir. 2014); <u>see also</u> <u>Kwan</u>, 737 F.3d at 847 ("Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage."); <u>El Sayed v. Hilton Hotels Corp.</u>, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a <u>prima facie</u> case of retaliation[,] . . . but without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext.  Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact." (citations omitted)).

Here, Zabar offers no evidence – other than temporal proximity – in support of her argument that Defendants' reasons for their adverse employment actions are pretextual.

As an initial matter, Zabar provides no direct evidence of retaliatory animus, such as "remarks that could be construed as indicating a retaliatory intent." Woolf v. Bloomberg L.P., No. 16-CV-6953 (PKC), 2019 WL 1046656, at *17 (S.D.N.Y. Mar. 5, 2019). Indeed, Zabar does not recall that Ureña or Rosales made any comments about her anxiety or depression. (Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 188) Zabar also does not recall ever telling Perez about her mental health conditions, much less Perez commenting about those conditions. (Id. at 175, 180, 189)

When Zabar requested a classroom change from Ureña in August 2016 in connection with her anxiety issues, Ureña "kind of nodded in agreement – okay, no problem." According to Zabar, Ureña "was generous and switched [Zabar's class]room," which Zabar believed "was very kind of him." (Id. at 173)

And when Zabar requested written instructions from Rosales in September 2016, Rosales did not comment on Zabar's anxiety and depression. Rosales merely rejected Zabar's request in a fashion that Zabar found "dismissive." (Id. at 174, 203)

According to Zabar, however, Ureña and Rosales used their knowledge of her anxiety and depression to manipulate her:

> People like [Ureña] when they find out that you have something like depression or anxiety, they see it as a weakness they can use to manipulate. So Mr. Ureña would find a way, and [Rosales] would find a way to trigger me usually during their disciplinary meetings or their post-observation conferences where they refused to listen to me, where they dismissed anything I did say as nonsense. They would tell me one thing to my face and then yell at me for doing it later on so they were gaslighting me. They were looking to trigger me so they would have something to write in their disciplinary reports that I lost my temper or I said something like a rat's ass because I was upset. . . .

> I don't think they came into my classroom and went, "Oh, look at the depressed
> person, let's fail her." I think they came into my classroom and they said, "We
> don't like her, let's use her depression and anxiety against her, what can we write
> on this observation that will upset her," and that is what they did.

(Id. at 181-82, 187-88) Zabar's assumptions regarding Defendants' motives amount to nothing

more than inadmissible speculation, however, and do not demonstrate that Defendants' reasons

for their alleged adverse actions are pretextual. See Nixon v. TWC Admin. LLC, No. 16-CV-

6456 (AJN), 2019 WL 1428348, at *5 (S.D.N.Y. Mar. 29, 2019) ("'[M]ere speculation and

conjecture' as to whether an employer's motives were discriminatory [is] 'insufficient to

preclude' summary judgment." (quoting Harlen Assoc. v. The Inc. Village of Mineola, 273 F.3d

494, 499 (2d Cir. 2001)).

      Nor has Zabar demonstrated pretext through circumstantial evidence, such as

"treatment that differed from similarly situated colleagues with a similar work history." Woolf,

2019 WL 1046656, at *17. While the Court acknowledges evidence that – after the arrival of

Ureña and Rosales at the High School for the 2016-17 school year – Zabar's classroom

observation reports went from being scored as "Effective" in most categories to being scored as

"Developing" or "Ineffective" in most categories (see Pltf. Opp. (Dkt. No. 108) at 19-20), Zabar

concedes that "[n]early everybody in the English department saw reduced ratings" after

Defendants' arrival at the High School. (Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-

2) at 106) Indeed, it is undisputed that four other teachers in the English Department

"experienced lower ratings during the 2016-2017 school year." (Def. R. 56.1 Stmt. (Dkt. No.

106) ¶ 21)

      Moreover, Ureña recommended bringing Education Law § 3020-a charges against

two other teachers at the High School: Jason Agosto and Todd Young. (Pltf. R. 56.1 Cntrstmt.

(Dkt. No. 109) ¶ 161) And while Ureña's September 2, 2017 text message to Superintendent

Marisol Rosales makes clear that he views Zabar, Agosto, and Young as "knucklehead teachers" who should be pushed out of the High School (see Glass Decl., Ex. 16 (Sept. 2, 2017 Ureña text msg.) (Dkt. No. 110-17) at 1), there is no evidence that his views regarding Zabar are informed in any fashion by her mental disabilities or by any alleged protected activity she engaged in. Indeed, in his text message, Ureña groups Zabar, Agosto, and Young together without drawing any distinction between them.  And there is no evidence in the record that Agosto and Young are disabled, that they requested accommodations for any disabilities, or that they complained about disability discrimination.

Zabar has also not demonstrated pretext by pointing to "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its actions." Kwan, 737 F.3d at 846.

With respect to the disciplinary letters issued to Zabar between November 2016 and June 2018, Zabar admits to much of the conduct described in the letters.  For example, Zabar admits that (1) on November 3, 2016 she had a discussion with Alice O'Neil "in the public lobby of the building" during which she criticized Rosales (Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 127; see Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶ 119); (2) during a December 19, 2016 conference, she told Rosales "[t]his is my livelihood and you don't give a rat's ass about it" (Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 150-51; Green Decl., Ex. H (Feb. 27, 2017 Ltr.) (Dkt. No. 105-8) at 1); (3) she "[s]ometimes" uses profanity in the classroom (Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 215); (4) on June 23, 2017 and February 2, 2018, she left the school early (id. at 217; Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶ 73); (5) after a meeting with Rosales on January 17, 2018, she said, "[d]one – write me up and put a letter in my file . . . write me up for my fucking tone, I don't care!" (Glass Decl., Ex. 1

(Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 255; Green Decl., Ex. P (May 2, 2018 Ltr.) (Dkt. No. 105-16) at 1); (6) she "used profanity" at a January 30, 2018 meeting with Rosales and that she left the meeting and did not return (Glass Decl., Ex. 1 (Zabar Dep.) (Dkt Nos. 110-1, 110-2) at 240, 253); (7) she failed to attend Common Planning Time sessions on February 28, 2018 and March 7, 2018 (id. at 256-57); (8) between October 2017 and June 2018, she was absent from work on fourteen days, even though she understood that she was limited to ten days' absence (id. at 258-60); and (9) in missing work for fourteen days, she did not inform her supervisors about the reasons for her absence. (Id. at 258-60) As to the remaining issues cited in the disciplinary letters, Zabar cites no evidence that undermines or contradicts the allegations of misconduct.

The same is true of the negative classroom observation reports that were issued to Zabar during the 2016-17 and 2017-18 school years. To be sure, Zabar testified that the ratings in the reports are "unwarranted"; that the evaluation forms "tell[] you what [she doesn't] do" in the classroom, rather than "what [she] actually do[es]"; that the forms contain "contradictions"; and that Rosales and Ureña "cherry pick[]" observations. (Id. at 133, 136, 147) And as to several of the negative observation reports, Zabar provides a more detailed explanation as to why she believes that her teaching on those occasions was effective. (See id. at 222-24, 227-28)

Each of the negative observation reports is, however, supported by several pages of detailed notes explaining the "Developing" or "Ineffective" ratings in each category. (See Green Decl., Ex. D (Dec. 12, 2016 Evaluation Form) (Dkt. No. 105-4) at 1-6; id., Ex. E (Mar. 22, 2017 Evaluation Form) (Dkt. No. 105-5) at 1-4; id., Ex. F (Mar. 24, 2017 Evaluation Form) (Dkt. No. 105-6) at 1-4; id., Ex. G (May 30, 2017 Evaluation Form) (Dkt. No. 105-7) at 1-4; id., Ex. L (Nov. 27, 2017 Evaluation Form) (Dkt. No. 105-12) at 1-5; id., Ex. M (Dec. 14, 2017 Evaluation Form) (Dkt. No. 105-13) at 1-7; id., Ex. O (May 1, 2018 Evaluation Form) (Dkt. No. 105-15) at

1-6)  While Zabar's testimony indicates that she and the Defendants disagree about the quality of her teaching as described in the observation reports, this factual disagreement does not demonstrate that Defendants' detailed explanations for the negative ratings are implausible or pretextual.

The Court acknowledges that Zabar filed grievances concerning three unfavorable observation reports in 2016 and 2017, and that these reports were expunged as a result of her grievances.  (See Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶¶ 118, 127, 136)  The reasons for Zabar's successful challenges appear to be technical and procedural, however, rather than substantive.  For example, the October 13, 2016 observation report was expunged because Ureña did not upload his "22 pages" of supporting documents in an electronic format, and as a result there was no available "lesson-specific evidence" for one evaluation category.  (Glass Decl., Ex. 20 (Mar. 20, 2017 Opinion and Award) (Dkt. No. 110-21) at 3-4)  The November 22, 2016 observation report was expunged because Ureña "did not write the evaluation report properly." (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 109) ¶ 127)  And an October 2, 2017 observation report was expunged because it "was submitted to [Zabar] after the 45 school day limit."  (Glass Decl., Ex. 21 (Dec. 14, 2017 Ltr.) (Dkt. No. 110-22) at 1)

Moreover, when Zabar appealed her overall performance rating of "Developing" for the 2017-18 school year, the arbitration panel reviewed Zabar's classroom observation reports for that school year and concluded that

> [t]he reports are detailed and specific.  They set forth substantial, uncontroverted evidence observed by the evaluators supporting their conclusions and the scores assigned. Simply put, we find the record devoid of evidence demonstrating the scores assigned were the result of any factor other than Zabar's pedagogy as evaluated during the classroom observations.

(Green Decl., Ex. CC (May 21, 2019 Opinion and Award) (Dkt. No. 105-29) at 17-18)  The

panel further found that "the overall rating of Developing assigned to Zabar for school year

2017-2018 was not due to harassment, or reasons not related to job performance."  (Id. at 16-17)

The arbitrators also considered whether the ratings assigned by Ureña and Rosales

(1) "were in retaliation for Zabar's outspoken advocacy" as a UFT representative, or (2) reflected

Zabar's "alleged unprofessional behaviors, which [were] criticized in the disciplinary letters

[issued between 2016 and 2018]," rather than the quality of her teaching.  (Id. at 16)  The panel's

conclusion that the observation reports were premised on the quality of Zabar's teaching further

undermines Zabar's arguments regarding pretext.

For all of these reasons, the Court concludes that Zabar has failed to raise a

material issue of fact as to whether Defendants' reasons for the alleged adverse actions are

pretextual.  Accordingly, Defendants are entitled to summary judgment on Zabar's ADA claim

against DOE and on her NYSHRL claim against Ureña, Rosales, and Perez.

**B.    NYCHRL**

As to the NYCHRL, "summary judgment is appropriate if 'the record establishes

as a matter of law' that discrimination or retaliation 'play[ed] no role' in the defendant's

actions."  Chen, 805 F.3d at 76 (quoting Mihalik, 715 F.3d at 110 n.8).

"[E]ven under the more relaxed NYCHRL standard, when 'plaintiff's sole

evidence of pretext' is 'the temporal proximity between plaintiff's complaints and Defendants'

discipline,' a NYCHRL retaliation claim cannot survive summary judgment if the employer has

shown a non-retaliatory reason for the plaintiff's mistreatment."  Sivio, 436 F. Supp. 3d at 802

(quoting Tomizawa v. ADT LLC, No. 13-CV-6366 MKB LB, 2015 WL 5772106, at *2

(E.D.N.Y. Sept. 29, 2015)); see also Chen, 805 F.3d at 76-77 (granting defendants summary

judgment on a NYCHRL retaliation claim where the alleged adverse action "came soon after

[plaintiff's] Affirmative Action complaint"); Forrester v. Corizon Health, Inc., 752 F. App'x 64, 66 (2d Cir. 2018) (summary order) ("[E]vidence of temporal proximity alone is not enough to demonstrate retaliation under the NYCHRL." (citing Chen, 805 F.3d at 76-77)); Adams v. Equinox Holdings, Inc., 662 F. Supp. 3d 444, 462 (S.D.N.Y. 2023), aff'd, No. 23-608, 2024 WL 1787108 (2d Cir. Apr. 25, 2024) ("[T]emporal proximity is insufficient to survive summary judgment [under the NYCHRL]."); Watkins v. New York City Transit Auth., No. 16 CIV. 4161 (LGS), 2018 WL 895624, at *9 (S.D.N.Y. Feb. 13, 2018) ("Even under the NYCHRL's more liberal standard, summary judgment is appropriate. Plaintiff has not proffered evidence, other than temporal proximity, to suggest that Defendant's legitimate, non-retaliatory reason for firing Plaintiff was false."); E.E.O.C. v. Bloomberg L.P., 967 F. Supp. 2d 816, 862 (S.D.N.Y. 2013) (granting summary judgment "[e]ven under a mixed-motives analysis under the NYCHRL" where "[plaintiff had] not offered any evidence other than temporal proximity to suggest any retaliatory animus on the part of [defendant]"); Aiossa v. Bank of Am., N.A., No. 10-CV-1275 JS ETB, 2012 WL 4344183, at *5 (E.D.N.Y. Sept. 21, 2012), aff'd, 538 F. App'x 8 (2d Cir. 2013) (under the NYCHRL, "temporal proximity, without more, is insufficient to show pretext").

Here, for all of the reasons explained above in connection with Zabar's ADA and NYSHRL claims, she has proffered no evidence beyond temporal proximity to suggest that Defendants' alleged adverse actions were motivated – even in part – by retaliatory animus related to (1) Zabar's requests for accommodation or (2) her complaints about disability discrimination. Because Zabar has not proffered evidence that creates a material issue of fact as to whether Defendants' reasons for the alleged adverse actions are pretextual under the NYCHRL, Defendants are entitled to summary judgment on her NYCHRL claim.

## **CONCLUSION**

For the reasons stated above, Defendants' motion for summary judgment (Dkt. No. 102) is granted.  The Clerk of Court is directed to terminate the motion (Dkt. No. 102), to enter judgment, and to close this case.

Dated: New York, New York
      September 24, 2024

                                    SO ORDERED.

                                    Paul G. Gardephe
                                    United States District Judge